MONIQUE C. WINKLER (Cal. Bar No. 213031)
  winklerm@sec.gov
SUSAN LAMARCA (Cal. Bar No. 215231)
  lamarcas@sec.gov
JENNIFER J. LEE (Cal. Bar No. 261399)
  leejen@sec.gov
ELENA RO (Cal. Bar No. 197308)
  roe@sec.gov
ERIN WILK (Cal. Bar No. 310214)
  wilke@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2500 (Telephone)
(415) 705-2501 (Facsimile)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>HARI PRASAD SURE,<br>LOKESH LAGUDU,<br>CHOTU PRABHU TEJ PULAGAM,<br>DILEEP KUMAR REDDY KAMUJULA,<br>SAI MOUNIKA NEKKALAPUDI,<br>ABHISHEK DHARMAPURIKAR, and<br>CHETAN PRABHU SREE KARTEEK PULAGAM,<br><br>Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "SEC") alleges as follows:

## SUMMARY OF THE ACTION

1. The defendants are a group of Twilio Inc. employees and their friends and family who unlawfully engaged in an insider trading scheme, by using material, nonpublic information the employees obtained to unlawfully trade in Twilio securities in advance of its quarterly earnings announcement on May 6, 2020.

2. Defendants Hari Sure, Lokesh Lagudu and Chotu Pulagam, who were friends, were employed as software engineers by Twilio, where they were responsible for supporting various databases relevant to the company's reporting of revenue. Between late March and early May 2020, these insider defendants accessed material, nonpublic information regarding the company's revenue using the Twilio databases. Each of these defendants then tipped close friends and family members who traded ahead of Twilio's first quarter earnings announcement on May 6, 2020.

3. Defendant Sure tipped his close friend, defendant Dileep Kamujula, who successfully traded in Twilio's options. Defendant Lagudu similarly tipped his girlfriend, defendant Sai Nekkalapudi, with whom he lived, and he also tipped his former roommate and close friend, defendant Abhishek Dharmapurikar. Defendants Nekkalapudi and Dharmapurikar profitably traded Twilio stock based on the information. In addition, defendant Chotu Pulagam tipped his brother, defendant Chetan Pulagam, who also traded Twilio securities ahead of the May 6, 2020 announcement.

4. In total, the trading ring netted over $1 million in illicit profits from trading Twilio securities based on the material, nonpublic information provided by the Twilio insiders Sure, Lagudu and Chotu Pulagam in the weeks leading up to the company's May 6, 2020 quarterly earnings announcement.

5. By engaging in this conduct, as further described herein, all defendants violated and, unless restrained and enjoined by this Court, are likely to continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5].

6. The SEC seeks an order from the Court enjoining defendants from future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; requiring them to disgorge the ill-gotten gains with prejudgment interest thereon; requiring them to pay civil monetary penalties; and providing for other appropriate relief.

## JURISDICTION AND VENUE

7. The SEC brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d); 78u-1].

8. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1331.

9. Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

10. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in San Francisco and Alameda County, Northern District of California.

11. Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco or the Oakland Division, because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in San Francisco or Alameda County.

## DEFENDANTS

12. Defendant Hari Prasad Sure, age 34, resides in Fremont, California. Sure joined Twilio as a software engineer in the company's Billing Platform group in March 2019.

13. Defendant Lokesh Lagudu, age 31, resides in Sunnyvale, California. Lagudu joined Twilio as a software engineer in August 2015, and in May 2020, Lagudu was in the same group at Twilio as Sure.

14. Defendant Chotu Prabhu Tej Pulagam, age 29, resides in Sunnyvale, California. Chotu Pulagam joined Twilio as a software engineer in August 2018 and is also in the same group as Sure and Lagudu.

15. Defendant Dileep Kumar Reddy Kamujula, age 35, resides in Fremont, California. Defendant Sure and defendant Kamujula are close friends and former co-workers at a different technology company whose securities are publicly traded. Defendant Kamujula continues to work for the other public technology company where he and Sure used to work together.

16. Defendant Sai Mounika Nekkalapudi, age 30, resides in Sunnyvale, California with Lagudu and is his girlfriend. Defendant Nekkalapudi works for another technology company whose securities are publicly traded.

17. Defendant Abhishek Dharmapurikar, age 33, resides in Mountain View, California. He is close friends with Lagudu and a former roommate. Defendant Dharmapurikar works for a private technology company.

18. Defendant Chetan Prabhu Sree Karteek Pulagam, age 31, resides in Santa Clara, California and is the older brother of Chotu Pulagam. Defendant Chetan Pulagam joined Twilio in June 2021, and previously, in the spring of 2020, he was working at a technology company whose securities were also publicly traded.

### RELATED ENTITY

19. Twilio Inc. is incorporated in Delaware and maintains its principal place of business in San Francisco, California, where the three insider defendants worked. Twilio develops and sells access to a cloud computing platform that enables companies to integrate various customer communications (e.g., phone calls, internet protocol voice communications, and text messages) within software applications. Twilio's common stock is registered with the SEC pursuant to Section 12(b) of the Exchange Act and is listed on The New York Stock Exchange ("NYSE") under the ticker symbol "TWLO."

### FACTUAL ALLEGATIONS

**A.  Defendants Sure, Lagudu And Chotu Pulagam Gain Access To Twilio Material, Nonpublic Information.**

20. During the first half of 2020, Twilio generated revenue from its cloud computing platform by charging usage-based fees to companies that increased their usage of a Twilio product, extended their usage of a Twilio product to new applications or adopted a new Twilio product.

21. Within Twilio, the group called the Billing Platform group was responsible for generating invoices to bill customers. To do so, the Billing Platform group created internal systems that aggregated customer usage.

22. Because these metrics – including the number and value of invoices generated and the aggregated customer usage – directly affected quarterly revenue numbers, the Billing Platform group was also involved in Twilio's month-end and quarter-end processes that the Company used to "close" and report its earnings and other financial information. The Billing Platform group worked with the Twilio revenue accounting team to provide data that was then used in the company's financial-close reporting, including its preparation of financial statements provided to its shareholders and reported to the SEC in periodic reports.

23. Defendants Hari Sure, Lokesh Lagudu and Chotu Pulagam were employed as software engineers within Twilio's Billing Platform group. To perform their jobs, Twilio entrusted these defendants regularly with confidential data. Sure, Lagudu, and Chotu Pulagam regularly accessed material, nonpublic information regarding the Company's quarterly revenue numbers through various accounting and customer billing platforms to complete tasks related to generating customer invoices, supporting the financial close process, and updating the company's internal databases regarding revenue.

24. Defendants Sure, Lagudu, and Chotu Pulagam agreed when hired by Twilio that they would keep information they learned during their employment confidential, as specified in and required by Twilio's Amended and Restated Policy on Insider Trading and Disclosure. They also specifically agreed not to make use of information they learned during their employment except for the benefit of the Company.

25. The Twilio insider trading policy stated: "In addition to restrictions on trading, Twilio Covered Persons are generally prohibited from the following activities when they know or are in possession of material non-public information: having others trade in the Company's securities for them; . . . and disclosing any material, nonpublic information about the Company to anyone else who might then trade, or recommending to anyone that they purchase or sell the Company's securities when such Twilio Covered Person is aware of material, nonpublic

information (these practices are known as 'tipping')."

26.     Defendants Sure, Lagudu, and Chotu Pulagam were also subject to Twilio's black out policy, which was part of its insider trading policy and prohibited trading by certain insiders during specified periods in the financial reporting cycle. That policy stated: "Even during an open trading window, it is generally illegal (and also a violation of the Company's Insider Trading Policy) for a Twilio Covered Person to trade in the securities of the Company while in the possession of material, nonpublic information about the Company."

**B.     Defendants' Insider Trading Scheme.**

27.     Defendants' insider trading scheme began in or about March 2020, when public health measures taken in light of the Covid-19 pandemic unexpectedly increased Twilio's customer usage.  Before those public health measures began, Twilio had publicly announced guidance about the Company's expected revenue and earnings per share for its first quarter 2020, which would end on March 31, 2020, and for subsequent periods.  However, prior to the close of the first quarter, Twilio's customers began to substantially increase their reliance on cloud communications as a result of the pandemic, and Twilio's revenues and earnings began to exceed those expectations by many multiples of the Company's prior guidance.

28.     In performing their responsibilities at Twilio, defendants Sure, Lagudu and Chotu Pulagam accessed various internal databases during the first quarter of 2020. The information reflected surprisingly outsized customer usage numbers as compared to prior months and quarters, which further reflected revenue for Twilio that far exceeded prior periods.

29.     Based on this inside information, Sure, Lagudu, and Chotu Pulagam realized in March 2020 that Twilio was performing financially much better than Twilio's public guidance and securities analysts' reported estimates for Twilio's anticipated first quarter 2020 earnings and revenue.

30.     Defendants Sure, Lagudu and Chotu Pulagam were friends, and they communicated at times in Telugu, a language used frequently in parts of India. From late March to early May 2020, they engaged in discussions about the upcoming earnings announcement within a private chat channel they created at Twilio. On several occasions between late March and early

May 2020, before Twilio's public earnings announcement, Sure, Lagudu and Chotu Pulagam used internal chat channels to discuss in Telugu whether Twilio might exceed market expectations in its quarterly report of earnings, due in May 2020. They concluded that Twilio's stock price would "rise for sure" after the quarterly results were announced publicly.

31.  For instance, on or about March 23, 2020, Lagudu disclosed in the chat channel that he had "checked" an internal revenue database and determined that "SMS and other costs increased this month" and that likewise, email revenue "was increased." Lagudu added details, stating that it appeared that while previously, certain customers were sending 250 million messages, by that point in March certain customer usage had nearly tripled. As the insider defendants recognized, these increased customer usage numbers translated into substantially increased revenue for Twilio.

32.  Defendants Sure, Lagudu, and Chotu Pulagam continued to discuss in this chat channel that by March 30, 2020, Twilio's quarterly revenue had already crossed the market expectations for the first quarter (which would end March 31, 2020), and that as a result Twilio's common share price would "rise for sure" for two to three days after the quarterly earnings announcement.

33.  Defendants Sure, Lagudu, and Chotu Pulagam also shared with each other information from a Twilio revenue database showing how just one customer's account resulted in an increase to Twilio's revenue from tens of thousands of dollars in previous months to nearly two million dollars in March.

C.  **Sure, Lagudu, and Chotu Pulagam Tipped Friends And Family, And Acted With Scienter.**

34.  Armed with valuable inside information they had obtained from Twilio, Sure, Lagudu and Chotu Pulagam began passing tips to their family and friends through phone calls and in-person visits in advance of Twilio's earnings announcement on May 6, 2020. The insider defendants shared this inside information with their respective family and friends with the expectation that the persons they tipped would trade in Twilio securities based on the information.

35.  Each of the trading defendants placed trades based on the tips, and their respective

trades reveal unusual circumstances further suggesting their reliance on the inside information. For instance:

    a. Kamujula met with Sure on April 8, 2020 and later that night began purchasing out-of-the-money Twilio call options. His trading thus depended on an increase in the market price of Twilio's shares that was not then expected, a typically riskier trade in which he stood to lose his investment if the price did not increase. The next morning, Sure wired approximately $10,000 to Kamujula, and Kamujula immediately used the funds to buy more Twilio call options. In the following weeks leading up to the May 6, 2020 announcement, Kamujula continued to buy more Twilio call options, increasing a position that depended on an increase in the market price of Twilio's stock. In early May 2020, Kamujula's Twilio orders were denied because of lack of funds and lack of credit in his account. Kamujula then turned to two other brokerage accounts to place more orders for Twilio call options. Kamujula eventually returned $10,000 by check to Sure after May 6 with the notation of "hand loan" – meaning, an unsecured loan made between friends.

    b. In the spring of 2020, Nekkalapudi began to trade Twilio securities using a brokerage account that had been inactive for several years. In the days before the May 6, 2020 earnings announcement, Nekkalapudi requested permission to trade options for the first time in her brokerage account. Despite never having previously traded Twilio securities, Nekkalapudi's account purchased Twilio call options and shares, either at the direction of Lagudu or based on tips passed from Lagudu.

    c. Similarly, Chetan Pulagam had a brokerage account that had also been inactive for several years prior to the spring of 2020. Shortly before the May 2020 Twilio earnings announcement, Chetan Pulagam similarly requested approval to trade options in his brokerage account; his request was made following phone calls with his brother Chotu Pulagam and discussions with Lagudu, and Chetan Pulagam thereafter purchased his Twilio call options.

        d. In the spring of 2020, Dharmapurikar, who was Lagudu's friend, had not previously traded Twilio securities in the relevant account since 2015. However, after a phone call with Lagudu on May 6, 2020, he immediately purchased out-of-the-money Twilio call options that had an expiration date of May 8, 2020.

36.    As Twilio insiders, defendants Sure, Lagudu, and Chotu Pulagam knew, or were reckless in not knowing, that their respective tippees would use the inside information they provided to purchase Twilio securities. As tippees, defendants Kamujula, Nekkalapudi, Dharmapurikar and Chetan Pulagam knew, consciously avoided knowing, or were reckless in not knowing, that Sure, Lagudu, and Pulagam breached the duty they owed to their employer Twilio by passing tips. Indeed, Kamujula, Nekkalapudi, Dharmapurikar, and Chetan Pulagam were themselves employees of other publicly traded companies, and they understood it was improper for the insiders to tip another person to trade securities on the basis of material, nonpublic information. Sure, Lagudu and Chotu Pulagam used their friends and family to profit personally from their insider trading scheme and to avoid detection.

37.    Sure, Lagudu and Chotu Pulagam knew, or were reckless in not knowing, they owed Twilio a duty to keep the material nonpublic information confidential, and that they were prohibited from using that information to trade Twilio securities or from sharing that information with anyone else for purposes of trading Twilio securities.

38.    On May 4, 2020 (just two days before the scheduled Twilio earnings announcement), Sure, Pulagam, and Chotu Pulagam discussed in the chat channel their anticipation that Twilio's stock price, which was then trading around $110 per share, would dramatically increase following the earnings announcement and readied themselves to sell their own company restricted stock units post-announcement. Sure noted "[l]ooks like [the stock price] is going to be $150," to which Chotu Pulagam responded "Miillionaireeeeee." Sure instructed the others that "[t]his time it would surely go to 150. You sell at 10%. When it reaches 170, sell another 10%."

39.    On May 6, 2020, after the market closed, Twilio publicly announced greater than expected earnings for the first quarter of 2020. Following the announcement, Twilio's closing

stock price increased approximately 40% from the prior day's closing price of approximately $122 per share, to close at approximately $170 per share on May 7, 2020. In total, the defendants' insider trading scheme realized over $1 million in illicit trading gains.

## FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

40. The SEC re-alleges and incorporates herein paragraph nos. 1 through 39.

41. By engaging in the conduct described above, Defendants Sure, Lagudu, Chotu Pulagam, Kamujula, Nekkalapudi, Dharmapurikar and Chetan Pulagam directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

    a. employed devices, schemes, or artifices to defraud;

    b. made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

    c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

42. By reason of the foregoing, Defendants Sure, Lagudu, Chotu Pulagam, Kamujula, Nekkalapudi, Dharmapurikar and Chetan Pulagam violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

43. In the alternative, defendant Nekkalapudi, by the conduct described above in paragraph nos. 1 through 39, knowingly or recklessly provided substantial assistance to defendant Lagudu so that he could engage in the conduct described above in paragraph 42, and defendant Nekkalapudi thereby aided and abetted defendant Lagudu's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

# PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court:

### I.

Permanently enjoin Defendants Sure, Lagudu, Chotu Pulagam, Kamujula, Nekkalapudi, Dharmapurikar and Chetan Pulagam from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### II.

Issue an order requiring Defendants to pay civil monetary penalties, pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

### III.

Issue an order requiring Defendants to disgorge an amount equal to their illegal potential trading profits from the securities transactions alleged in this Complaint, plus prejudgment interest.

### IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### V.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: March 28, 2022					Respectfully submitted,


					    /s/ Elena Ro
					ELENA RO
					Attorneys for Plaintiff
					SECURITIES AND EXCHANGE COMMISSION